1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CARA A. BURKE,

        Plaintiff,

  v.

PITNEY BOWES INC. LONG TERM
DISABILITY PLAN,

        Defendant.

_____/

No. C 04-4483 MHP

**OPINION**

**Re: Cross-Motions for Judgment**

      Plaintiff Cara A. Burke seeks, pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), review of the decision of defendant Pitney Bowes Inc. Long Term Disability Plan ("the Plan") to deny Burke long term disability ("LTD") benefits.  The action was initially filed in late 2004.  On January 3, 2006, this court denied Burke's motion for summary judgment, granted the Plan's motion for summary judgment, and entered judgment for the Plan.  See Docket No. 38. Burke subsequently appealed.  While her appeal was pending, the U.S. Supreme Court and the U.S. Court of Appeals for the Ninth Circuit had occasion to revisit and substantially revise the legal standards pertaining to structural conflicts of interest in ERISA cases.  In light of these changes in the law, on September 19, 2008, the Court of Appeals vacated this court's earlier judgment and remanded the action for consideration under the appropriate legal standards.  See Burke v. Pitney Bowes Inc. Long-Term Disability Plan, 544 F.3d 1016 (9th Cir. 2008).

Now before the court are the parties' cross-motions for judgment on the limited issue of whether the Plan abused its discretion by denying Burke's claim on the basis of her refusal to attend a medical examination. The court, having read and considered the documentary evidence and the written submissions of the parties, now makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. The background facts of the action having been set forth extensively in this court's prior order and the opinion of the Court of Appeals, the findings of fact set forth below are limited to those facts relevant to the instant motion. To the extent that any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact, and to the extent that any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.

FINDINGS OF FACT

1. Plaintiff Burke was employed by Pitney Bowes Inc. ("the plan sponsor") as a sales employee. During Burke's employment with the plan sponsor, she participated in the Plan. The Plan is funded by both employee contributions and voluntary contributions of the plan sponsor. Administrative Record ("AR") at 21. Contributions are made to a non-reversionary Voluntary Employees' Beneficiary Association ("VEBA") trust. Id.

2. Burke was involved in two motor vehicle accidents in 1998. The first occurred on June 3, 1998, and the second occurred on July 7, 1998. One accident was work-related and one accident was not. AR at 165, 235. Burke went out on disability in October 1998. AR 236.

3. On September 26, 2002, Burke and the Plan entered into an agreement settling an earlier litigation. Among other things, the Plan agreed to pay Burke $43,105.06, less required withholdings, to cover claims for the 1999-2002 time period. The settlement agreement also provided:

United States District Court

For the Northern District of California

> Commencing August 1, 2002, Burke shall receive monthly long-term disability benefits pursuant to the terms, process and procedures of the Plan, as long as she continues to meet the Plan's definition of "Total Disability" and otherwise remains eligible under the Plan.  This provision is in no way meant to alter or modify the terms, process or procedures set forth in the Plan for receiving benefits under the Plan.  Burke's eligibility for future benefits will be solely governed by the terms, process and procedures of the Plan and ERISA.

AR at 248.  The Plan began to pay benefits to Burke in accordance with this provision and the terms of the Plan.

4.  On September 29, 2003, the Plan's physician consultant, Arthur I. Broder, M.D., wrote to Burke's treating physician, Ward Gypson, M.D., requesting that Gypson send copies of Burke's medical records.  Broder noted that "Ms. Burke's disability status necessitates ongoing medical documentation."  AR at 298.

5.  On October 9, 2003, Burke submitted, at the request of Broder, to an independent medical examination ("IME") by Richard Barry, M.D.  Barry wrote in his report: "My impression is that Ms. Burke has an objectively normal physical and neurologic examination, but she demonstrates a very high level of self-perceived impairment.  At this point, it appears that her described pattern of subjective symptoms are unsupported by any abnormal objective physical or neurologic findings."  AR at 104.

6.  The Plan notified Burke by letter dated November 3, 2003, that Burke no longer qualified for LTD benefits.  The Plan stated that, based on a review of Burke's medical records obtained from Gypson and the results of the examination by Barry, the medical information did not substantiate that Burke was totally disabled for any occupation as defined in section 2.33(a) of the Plan.  AR at 82.

7.  Under the "any occupation" provision of section 2.33(a), "totally disabled" means

the Participant is unable, because of injury or illness, to engage in any gainful occupation or profession for which he is, or could become, reasonably suited by education, experience, or training; provided, however, that the amount of earnings that the Participant would receive from engaging in such occupation or profession

would be less than sixty percent of the Participant's annual or annualized earnings immediately prior to the event giving rise to the Total Disability.

AR at 11.[1]

8.  The November 3, 2003, letter further stated that Burke could return to light duty work and noted Barry's impression that Burke's subjective symptoms were unsupported by any objective physical or neurologic findings.  AR at 82.

9.  The Plan's Disability Department accordingly terminated Burke's long-term disability payments effective November 1, 2003.  AR at 82.

10.  Burke, through her attorney, Constantin V. Roboostoff of Roboostoff & Kalkin, filed an appeal from the decision, on January 6, 2004.  AR at 197.  Under the Plan, appeals to decisions of the Disability Department are heard by the Employee Benefits Committee ("the Committee"), which is the plan administrator for purposes of ERISA.  AR 22-24.

11.  In the following weeks, some correspondence between the Plan and Burke's attorney ensued. On March 4, 2004, the Plan stated, *inter alia*, in a letter, "First, please note that there are no 'additional materials or information necessary' for Ms. Burke to perfect her claim."  AR at 232.

12.  On May 5, 2004, Burke's attorney provided an attorney for the Plan with copies of medical reports prepared by Dr. Marvin V. Zwerin on March 23, 2004, and May 4, 2004, and a copy of a Functional Capacity Evaluation (FCE) report prepared by Lok Chan, an occupational therapist, on April 22, 2004.  AR at 121-122.

United States District Court

For the Northern District of California

4

United States District Court

For the Northern District of California

13. Zwerin's report of March 23, 2004, disagreed with Barrry's October 2003 conclusions, stating:

> Ms. Burke . . . has lived with chronic neck and back pain since 1998, some 6 years now. . . . Aside from Dr. Barry, no physician has suggested that she is lying, hysterical or engaging in symptom magnification.  Given that he saw her on but one occasion and at least 4 other physicians have seen her on multiple occasions with observations reinforced by an entire team of PhD, PT/OT and other professionals without anyone ever concluding that her presentation was other than legitimate, the conclusions by Dr. Barry are clearly devoid of legitimacy.

AR at 130.  Zwerin described Barry's conclusions as "preposterous."  AR at 131.  Zwerin noted that Burke seemed to have incorrectly made marks on her pain drawing during her examination by Barry such that it appeared she was "creating the inappropriate perception that she was reporting pain outside her body."  Zwerin suggested that this misunderstanding concerning the marking of the pain drawing might account for Barry's conclusion that Burke's reports of pain resulted from histrionics. AR-131.

14.  At Zwerin's recommendation, Burke participated in the FCE with Chan.  Chan's FCE report of April 22, 2004, concluded, "Ms. Burke is unable to tolerate prolonged static sitting or standing positions. . . . Based on the results of this FCE, Ms. Burke is currently unable to return to any type of gainful employment.  She does not meet any of the physical demand characteristics of work as defined by the Department of Labor."  AR at 137.  Zwerin stated on May 4, 2004, that he reviewed the FCE results and that they confirmed that Burke could not return to the workforce.  AR at 140.

15.  In a letter dated May 20, 2004, the Plan acknowledged receipt of the May 4, 2004, letter and the accompanying reports.  The Plan stated, "In order to corroborate your evidence and test its credibility, an independent FCE for Ms. Burke has been scheduled for Monday, June 28th at 9 a.m. at Ms. Burke's residence."  AR at 141.

16.  Burke participated in the June 28, 2004, FCE, which was administered by PhysioMetrics and was videotaped.  AR at 107.  The physiologists who administered the tests wrote a report dated June 30, 2004.  In that report, they stated that Burke demonstrated a "sub-consistent effort" but

United States District Court

For the Northern District of California

nevertheless concluded that "the individual's true functional capacity is likely to be close to the actual abilities demonstrated during the FCE." Id. They noted that Burke declined many of the activities during the evaluation. They were unable to determine "safe return to work levels" because they had not been given a job analysis for Burke. Id. at 108.

17. By letter dated July 6, 2004, the Plan informed Burke's attorney that it would soon forward a copy of PhysioMetrics's FCE report and video. The letter also informed counsel that the Plan had asked Barry to review the FCE report and video and perform an orthopedic spinal evaluation of Burke. AR at 183.

18. By letter dated July 19, 2004, Burke's attorney informed the Plan, "Ms. Burke will not submit herself to any further examinations prior to the time her appeal is scheduled to be considered by the Employee Benefits Committee . . . ." The attorney wrote, "Dr. Barry, pursuant to Pitney Bowes' request, has already examined Ms. Burke and expressed his opinions. Neither the Plan nor ERISA regulations require Ms. Burke to submit to multiple, unreasonable and unnecessary medical examinations." AR at 184-185.

19. A memorandum to the file from the Plan's "HR Legal Senior Attorney," dated July 20, 2004, states that counsel for the Plan called Burke's attorney on that date and informed him that refusing to attend the evaluation provides procedural grounds for benefits termination pursuant to section 5.7(d) of the Plan. AR at 187.

20. Section 5.7(d) provides:

> Notwithstanding anything construed in this Plan to the contrary, the Monthly Disability Income payable to a Participant may be suspended or discontinued if the Participant: . . . (d) refuses to attend an independent medical examination which is scheduled within a reasonable distance from the Participant's primary residence or for which the Company has made reasonable arrangements for the Participant to attend . . . .

AR at 20.

21.   The Plan sent a letter to Burke's attorney dated July 27, 2004, proposing August 23, 2004, as the date for the second IME with Barry and stating that livery service could be arranged to transport Burke to and from Barry's office.  The letter also said that Burke's appeal would be presented to the Committee in September 2004 and noted that Burke's attorney had stated that Burke would not submit to any further examinations prior to her appeal.  The letter quoted section 5.7(d), noted that "reasonable and prudent disability case management" suggests IMEs, and stated that the Committee should be given every opportunity to review the most recent medical evidence.  The letter specifically warned:

> Please be advised that failure to submit to an independent medical examination, in and of itself, is grounds to deny Ms. Burke's appeal purely on procedural grounds. Moreover, it will allow the Committee should, [sic] it decide the case on its merits, to rely on Dr. Barry's examination and conclusions based on his examination of November [sic] 2003, as it will not have a more recent examination from an independent medical examiner.  Should you or Ms. Burke reconsider your refusal to submit to an independent medical examination by Dr. Barry, please notify [us] immediately so that one can be scheduled without further delay.  Otherwise we will submit the case and associated medical information as is to the Committee with a note that the claimant refused to submit to a recent independent medical examination.

AR at 189.

22.  Burke's attorney responded via a letter dated July 27, 2004, that his client would not consent to a second examination by Barry:

> Neither the Plan, nor "prudent disability case management," require Ms. Burke to submit to multiple, unreasonable and unnecessary medical examinations. . . . Apparently you have not bothered to review the administrative record.  For if you had, it would have become readily apparent to you that it contains abundant medical evidence, both past and recent, describing the claimant's medical condition. . . . In conclusion, I take exception to your veiled threats and welcome a judicial review of the administrative record if Pitney Bowes denies Ms. Burke's appeal.

AR at 191.

**United States District Court**
For the Northern District of California

23.  Unable to examine Burke in person, Barry nevertheless reviewed the report and video from the June 2004 FCE.  Based on this review, Barry reported by letter dated August 24, 2004, that he stood by his report of October 2003.  AR at 73-74.

24.  On September 27, 2004, the Committee met to consider Burke's appeal.  The Committee found two procedural bases for denying the appeal: (1) Burke's refusal to participate in the requested second IME, and (2) the fact that "Ms. Burke's initial and current claim were not submitted within the LTD Plan's time limitations."  In addition to finding denial of benefits appropriate on procedural grounds, the Committee concluded that denial was appropriate based on Burke's physical condition.  The Committee relied primarily upon Barry's October 2003 medical examination, finding it to be more credible that Zwerin's opinion.  The Committee also noted that Burke's physician, Gypson, reported that Burke could perform the activities of daily living with some limitations, and that Burke was not participating in any treatment plan.  The Committee's report also concluded that Burke's claim could be excluded on the basis that it was a work-related injury.  AR at 68-69.

25.  In reference to the Committee's decision to deny benefits on the basis of Burke's refusal to attend a second IME with Dr. Barry, the Committee minutes note: "The members found the IME request to be reasonable given the new medical reports and FCE submitted by Ms. Burke in support of her appeal, the dated nature of the prior IME, and the fact that the Disability Department had arranged transportation for Ms. Burke to and from the IME, which was a reasonable distance from Ms. Burke's home."  AR at 68.

26.  The three members of the Committee that reviewed and denied Burke's appeal were all employees of Pitney Bowes Inc., the plan sponsor.  Specifically, they were Pitney Bowes Inc.'s Executive Director for Investor Relations, Director for Pension/Benefits Planning Investments, and Senior Vice President/Chief Human Resources Officer.  Roboostoff Dec., Exh. 33 (response to interrogatory) at 2.[2]

8

1   ///

2   ///

3   ///

4   ///

5   <u>CONCLUSIONS OF LAW</u>

6   I.        <u>Standard of Review</u>

7   1. ERISA provides for judicial review of a decision to deny benefits to an ERISA plan beneficiary.

8   <u>See</u> 29 U.S.C. § 1132(a)(1)(B).

9

10  2. ERISA creates federal court jurisdiction to hear such a claim.  <u>See</u> <u>id.</u> § 1132(e).

11

12  3.  In determining the appropriate standard of review, a court should be guided by principles of trust

13  law, analogizing a plan administrator to the trustee of a common law trust.  A benefit determination

14  should be considered to be a fiduciary act, i.e., an act in which the administrator owes a special duty

15  of loyalty to the plan beneficiaries.  <u>Metropolitan Life Ins. Co. v. Glenn</u>, ___ U.S. ___, ___, 128

16  S.Ct. 2343, 2347 (2008), <u>quoting</u> <u>Firestone v. Bruch Tire & Rubber Co.</u>, 489 U.S. 101, 111-113

17  (1989).

18

19  4.  ERISA benefits determinations are to be reviewed *de novo*, unless the benefit plan gives the

20  administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe

21  the terms of the plan.  <u>Id.</u>, 128 S.Ct. at 2348; <u>see also</u> <u>Firestone</u>, 489 U.S. at 115.

22

23  5.  Where an administrator has retained discretionary authority, "trust principles make a deferential

24  standard of review [i.e., review for abuse of discretion] appropriate."  <u>Glenn</u>, 128 S.Ct. at 2348,

25  <u>quoting</u> <u>Firestone</u>, 489 U.S. at 111.  An administrator has discretion only where it is "unambiguously

26  retained."  <u>Kearney v. Stanford Ins. Co.</u>, 175 F.3d 1084, 1090 (9th Cir. 1999), <u>quoting</u> <u>Bogue v.</u>

27  <u>Ampex Corp.</u>, 976 F.2d 1319, 1325 (9th Cir. 1992).

28

9

6.  In reviewing for an abuse of discretion, the court must evaluate all the facts and circumstances to make something "akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records." Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 969 (9th Cir. 2006).

7.  A conflict of interest can exist for ERISA purposes when an entity both evaluates claims as the plan administrator and pays benefits under the plan. See Glenn, 128 S.Ct. at 2349-2350. Such a conflict is termed a "structural" conflict of interest. Abatie, 458 F.3d at 965. The fact that the entity which evaluates claims and pays benefits is a trust does not eliminate the structural conflict: "[E]ven when a plan's benefits are paid out of a trust, a structural conflict of interest exists that must be considered as a factor in determining whether there was an abuse of discretion." Burke v. Pitney Bowes Inc. Long-Term Disability Plan, 544 F.3d 1016, 1026 (9th Cir. 2008).

8.  Where a benefit plan gives discretion to an administrator who is operating under a conflict of interest, "that conflict must be weighed as a factor in determining whether there is an abuse of discretion." Glenn, 128 S.Ct. at 2348, quoting Firestone, 489 U.S. at 115. When judges review the lawfulness of benefit denials, they will take into account several considerations, of which a conflict of interest is one. Id. at 2351. "The conflict of interest . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and promote accuracy . . . ." Id. (internal citation omitted). The role that a conflict of interest will play will vary depending upon the circumstances of each case: there "are no talismanic words that can avoid the process of judgment." Id. at 2352.

9.  A particular course of action can both justify giving more weight to a conflict and serve as an important factor in its own right.  Id.

10.  A court may view the decision of a conflicted administrator with a low level of skepticism "if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history."  Abatie, 458 F.3d at 968.  On the other hand, a court may weigh a conflict more heavily "if, for example, the administrator provides inconsistent reasons for denial, fails adequately to investigate a claimant's reliable evidence, or had repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record."  Id. at 968-969.

11.  "Although an ERISA plan is a contract, ERISA does not contain a body of contract law to govern the interpretation and enforcement of employee benefit plans."  Gilliam v. Nevada Power Co., 488 F.3d 1189, 1194 (9th Cir. 2007) (internal citations and quotations omitted).  Courts therefore normally "apply contract principles derived from state law . . . guided by the policies expressed in ERISA and other federal labor laws."  Id.  These principles comprise a "nationally uniform federal common law" applied in the ERISA context.  See Saltarelli v. Bob Baker Group Med. Trust, 35 F.3d 382, 386 (1994).

12.  Under the uniform federal common law, courts should interpret plan terms "in an ordinary and popular sense as would a person of average intelligence and experience."  Babikian v. Paul Revere Life Ins. Co., 63 F.3d 837, 840 (9th Cir. 1995), quoting Evans v. Safeco Life Ins. Co., 916 F.2d 1437, 1441 (9th Cir. 1990).

13.  The court "may, in its discretion, consider evidence outside the administrative record to determine the nature, extent, and effect on the decision-making process of the conflict of interest; the decision on the merits [under the abuse of discretion standard], though, must rest on the

1   administrative record once the conflict (if any) has been established, by extrinsic information or

2   otherwise." Abatie, 458 F.3d at 970.

3

4   II.      Judgment Under Rule 52

5   14. Since a court reviewing for an abuse of discretion must review the administrative record and

6   make something "akin to a credibility determination" about the plan administrator's decision to deny

7   benefits, Abatie, 458 F.3d at 969, the court should set forth findings of fact and conclusions of law

8   pursuant to Federal Rule of Civil Procedure 52.  See Pannebecker v. Liberty Life Assur. Co. of

9   Boston, 542 F.3d 1213, 1217 (9th Cir. 2008).  Accordingly, cross-motions may be decided pursuant

10  to Rule 52 even where one or both parties has styled its motion as a motion for summary judgment.

11  Hoskins v. Bayer Corp. & Bus. Serv. Long Term Disability Plan, 564 F. Supp. 2d 1097, 1103 (N.D.

12  Cal. 2008) (Chesney, J.).[3]

13

14  III.     The Committee's Denial of Burke's Appeal

15  15.  The parties agree that the Plan retained discretionary authority to determine eligibility for

16  benefits and construe the plan terms.[4]  They also agree that the Plan has a structural conflict of

17  interest.  Accordingly, the legal framework set forth in Glenn and Abatie applies.  The court must

18  examine the role of the conflict of interest and then determine, taking the conflict of interest into

19  consideration as one factor in its determination, whether the administrator abused its discretion.

20

21          A.       Conflict of Interest

22  16.  The Court of Appeals noted that Plan benefits are paid out of the Plan's trust, which is a VEBA

23  trust.  This means that there is no *direct* financial impact on the plan sponsor, Pitney Bowes Inc.,

24  resulting from distribution of benefits.  The Court of Appeals found this to be a mitigating factor in

25  the evaluation of the Plan's structural conflict.  See Burke, 544 F.3d at 1025-1026.  That court held,

26  however, that the fact that benefits are paid from a trust does not mean that no structural conflict

27  exists.  The less benefits that are paid out, the less the employer will have to pay into the trust to

28

**United States District Court**
For the Northern District of California

12

United States District Court

For the Northern District of California

ensure its solvency.  Id. at 1026.  A second mitigating factor identified by the Court of Appeals is the fact that employees make some contribution to the Plan.[5]  Each dollar paid out in benefits by the trust does not result in the expenditure of a full dollar by the employer.  Nevertheless, the more that the trust pays out in benefits, the more the plan sponsor must contribute to maintain the trust's solvency.  Id. at 1026-1027.  A factor that aggravates the conflict of interest is the fact that the Plan is an employer funded and administered plan.  As the Court of Appeals wrote, "The Supreme Court indicated that it viewed employer funded and administered plans as creating a greater structural conflict than an insurer administered and funded plan."  Id. at 1027, citing Glenn, 128 S.Ct. at 2348-2350.  Weighing these factors, the Court of Appeals concluded that a structural conflict of interest exists here but that "the Plan creates less of a structural conflict of interest than the structural conflict of interest that exists with the typical dual-role plan."  Id.  The Court of Appeals remanded the action so that this court could consider the structural conflict of interest as a factor in the abuse of discretion analysis as required under Glenn.

17.  Burke argues that the Plan's conflict of interest remains heavy and that the Plan's decision should accordingly be treated with a high degree of skepticism.  In support of this view, Burke cites the Committee's invocations of Plan sections 5.4(a) and 5.8(j) as alternate bases to deny her claim.  The first section contains the requirement that a participant support her initial claim for benefits within one year of her injury.  According to the Committee, the appeal could be denied because "Ms. Burke's initial and current claim were not submitted within the LTD Plan's time limitations."  The second section invoked by the Committee, section 5.8(j), contains an exclusion for cases in which an employee's injury is due to a work-related injury or illness.[6]  Burke contends that these justifications for denial are a unsupportable in light of the history of her claim.  According to Burke, if there were any genuine issue concerning timeliness or whether the injury was non-work-related, it was waived when the Plan agreed to pay benefits covering the 1999-2002 time period and into the future.  Burke argues that the invocation of these grounds in 2004 demonstrates that the Plan administered Burke's

1  claim "as an adversary bent on denying [her] claim and oblivious to [its] fiduciary obligations as

2  administrator of the LTD Plan." Friedrich v. Intel Corp., 181 F.3d 1105, 1110 (9th Cir. 1999).

3

4  18.  The Plan offers no explanation for the Committee's decision to cite these grounds for denial

5  despite the fact that the Plan had already paid LTD benefits to Burke.  The Plan's 2002 decision not

6  just to settle past claims with Burke but to agree to pay LTD benefits as long as she was disabled

7  pursuant to the Plan's provisions can be understood as nothing other than an admission that Burke

8  was not foreclosed from receiving benefits.  The facts regarding timeliness of the claim and whether

9  the injury can be considered work-related have not changed since the date of settlement.  The fact

10  that the Committee suddenly, in 2004, resurrected these arguments for denial suggests that the

11  Committee had taken more of an adversarial stance to Burke than is consistent with the Committee's

12  role as a fiduciary.  Burke is correct that this weighs in favor of giving more weight to the conflict of

13  interest.

14

15  19.  The Plan nevertheless argues that its structural conflict of interest is "minimal."  The Plan

16  contends that the court should place great weight on the fact that Plan benefits are paid from a non-

17  reversionary trust that is only partially funded by the plan sponsor.  The Plan points to two recent

18  cases decided by this court in which plans paying into VEBA trusts were found to have only

19  minimal structural conflicts of interest.  In Hoskins v. Bayer Corp. & Bus. Serv. Long Term

20  Disability Plan, 564 F. Supp. 2d 1097 (N.D. Cal. 2008) (Chesney, J.), the court found in favor of the

21  defendant LTD plan, finding "no reason to accord [its] conflict any significant weight."  Id. at 1104.

22  In making its determination, the Hoskins court cited two similar but decidedly distinct legal

23  principles.  Firstly, citing Abatie, the court noted that the plaintiff failed to submit any evidence of

24  malice, self-dealing or a parsimonious claims-granting history.  Id.; see Abatie, 458 F.3d at 968.

25  Here, the Plan correctly points out that Burke has not produced such evidence.  Secondly, the

26  Hoskins court cited Glenn's instruction that a "structural conflict ordinarily will be less important

27  where the administrator 'has taken active steps to reduce potential bias.'"  Hoskins, 564 F. Supp. 2d

28

United States District Court
For the Northern District of California

1   at 1104, quoting Glenn, 128 S.Ct. at 2351.  The examples of such steps given by the Glenn court are

2   "walling off claims administrators from those interested in firm finances" and "imposing

3   management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy

4   benefits."  128 S.Ct. at 2351.  In the instant case, the Plan has submitted no evidence concerning the

5   latter step, whereas Burke has submitted evidence, in the form of an answer to an interrogatory,

6   showing that the Committee is anything but "walled off" from those interested in firm finances.

7   Indeed, all three members of the Committee who denied Burke's appeal are employees of the plan

8   sponsor, and at least two of their job titles suggest an interest, and likely a strong one, in firm

9   finances.

10

11   20.  In Moos-Holling v. Bayer Corp. Disability Plan, No. C 07-06420, 2009 WL 192591 (N.D. Cal.

12   Jan. 26, 2009) (Illston, J.), the court likewise ruled in favor of the defendant plan.  The Moos-

13   Holling case was decided after the Court of Appeals decision in Burke, and it discussed the factors

14   identified by the Court of Appeals.  The Moos-Holling court found the structural conflict in the case

15   before it to be "minimal."  Id. at *7.  In so doing, the court discussed the relevant factors but did not

16   explicate in detail why, "[o]n balance," the structural conflict was minimal in that case.

17

18   21.  The Plan would have the court announce that a structural conflict must be held to be "minimal"

19   whenever a plan sponsor pays into a VEBA or other non-reversionary trust and pays only a part of

20   the funds distributed to participants.  The court declines to accept such a categorical rule.  The

21   Supreme Court has instructed quite explicitly that these cases are to be viewed with an eye toward

22   the specific circumstances of each case.  See Glenn, 128 S.Ct. at 2352 (warning against "creating

23   formulas that will falsify the actual process of judging or serve as instruments of futile casuistry")

24   (citation and internal quotations omitted).  This court hews to the Court of Appeals's holding in

25   Burke that the conflict in this case is "less of a structural conflict of interest than the structural

26   conflict of interest that exists with the typical dual-role plan."  544 F.3d at 1027.  Yet considering

27   that the plan administrator comprises individuals highly interested in the finances of the plan

28

15

United States District Court

For the Northern District of California

1    sponsor, and considering that they invoked arguments in support of denial that the Plan had waived

2    years earlier, the court holds that the structural conflict of interest in this case is nevertheless

3    substantial.

4

5

6         B.     <u>Abuse of Discretion</u>

7    22.  Burke does not dispute that she "refuse[d] to attend an independent medical examination"

8    within the meaning of section 5.7(d) of the Plan, or that such refusal constitutes grounds for LTD

9    benefits being "suspended or discontinued."  Nor does Burke dispute that she had advance notice

10   that the Plan would consider a refusal to submit to a second IME to be grounds to deny her appeal.

11   Burke was represented by experienced counsel, and the Plan explicitly informed Burke's attorney by

12   letter dated July 24, 2004, receipt of which was later acknowledged by the attorney, that such refusal

13   would be grounds to deny her appeal.  Burke instead argues that the Plan's request that Burke submit

14   to a second examination by Barry was unreasonable.  She also argues that her refusal to submit to

15   such an examination did not cause prejudice to the Plan and thus should not have been considered an

16   independent ground for denial of her appeal.

17

18        1.     <u>Reasonableness of the Plan's Request for a Second IME</u>

19   23.  Reasonableness is a touchstone of the law, and it is no less so in the ERISA context.  <u>See, e.g.</u>,

20   <u>Babikian</u>, 63 F.3d at 840.  Plaintiff contends that the Plan's request for a second examination by

21   Barry was unreasonable and that she was therefore within her rights to refuse it without suffering

22   negative consequences.  She advances three reasons why the request was unreasonable, namely: (1)

23   Barry had already examined her once and given his opinion; (2) a second IME was unnecessary and

24   would reveal no new information; and (3) Barry was not qualified to speak to the issue of whether

25   plaintiff was capable of earning sixty percent of her previous income, a requirement for finding a

26   participant not totally disabled.

27

28

United States District Court

For the Northern District of California

24.  Barry's first examination of Burke took place on October 9, 2003.  The Plan attempted to schedule the second examination in advance of the September 2004 meeting of the Committee, on August 23, 2004—more than ten months later.  During those ten months, Burke had been examined by a physician of her choice and undergone an FCE with an evaluator of her choice, and she had submitted to an FCE with an evaluator chosen by the Plan.  She had not, however, been examined by a physician of the Plan's choice, a so-called "independent medical examiner."  In cases concerning LTD benefits, both the participant and the plan have legitimate concerns about bias on the part of examining physicians.  See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 832 (2003) ("And if a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding of 'disabled.'").  Just as it is reasonable for a participant to be allowed to submit the findings of physicians of her choice, so too is it reasonable for a plan to require the participant to submit to an examination by a physician of the plan's choice.[7]  To be sure, a plan could use a provision such as section 5.7(d) in an unreasonable way.  To take an extreme example, a request by a plan for someone in Burke's position to submit to weekly examinations could only be construed as harassment or an attempt to deter the participant from seeking benefits, and would be unreasonable.  However, there is nothing unreasonable about asking a participant to submit to an IME in advance of an appeals determination when the last IME was more than ten months in the past, the results of the last IME had been called into question by intervening reports, and the circumstances of the proposed second IME were otherwise reasonable, as was the case here.[8]

25.  Moreover, a second examination by Barry was especially appropriate in light of Zwerin's adamant disagreement with Barry's conclusions of October 2003.  Zwerin had even pointed out in his report a possible explanation for his and Barry's divergent views about whether Burke showed histrionics, i.e., the way Burke had filled in the pain chart during her examination with Barry.  Under these circumstances, it was eminently reasonable for the Plan to request not just another IME but specifically one with Barry, which would allow Barry to remedy the purported deficiencies in his

United States District Court

For the Northern District of California

earlier examination and address the conflict of opinions between himself and Zwerin.  Burke's attorney noted at oral argument that Burke would not have had an opportunity to "respond" to the results of the second IME or get yet another opinion from a physician of her choice, because the second IME was to take place only a handful of weeks before the Committee decided the appeal.  It is understandable that Burke might not wish to return to Barry for fear that he would stand by his earlier opinion, but simply refusing to attend the IME in violation of the plan terms was not the right approach.  Had she submitted to the examination and had Barry again found her not to be disabled using a cursory or unsupportable rationale, then a case for finding an abuse of discretion where the Committee based its conclusion on Barry's opinion would be stronger.  Burke's refusal to meet her contractual obligations hardly buttressed her position in litigation.

26.  Burke also asserts that the administrative record "demonstrates that the reasons offered by the Plan for the necessity of a post-appeal examination were a sham because any information that might have been obtained from a second examination would not have altered the Committee's ultimate decision to deny benefits."  Pf.'s Mot. at 13.  This argument is based entirely on conjecture.  Without Burke ever having attended the second IME, it is impossible to know what information would have been obtained.  Indeed, the IME results might have been favorable to Burke's position, thereby substantially changing the mix of evidence before the Committee.

27.  As Burke notes, Barry was unqualified to speak to the ultimate question of whether Burke was capable of employment that would pay sixty percent of her previous income.  Barry is neither an economist nor a labor specialist.  Yet Burke is incorrect that the request for a second IME was unreasonable because an examination by Barry would have been irrelevant.  The ultimate issue of whether Burke qualified for LTD benefits required answering at least two discrete questions: Firstly, what was Burke medically capable of doing?  Secondly, within those parameters, were there occupations that would pay an income amounting to sixty percent of Burke's earlier income?  While Barry was unqualified to opine on the second question, as a physician he was eminently qualified to

1   opine on the first.  Accordingly, an examination by Barry was relevant to the Committee's decision,

2   and the request for such an examination was reasonable.

3   ///

4   ///

5   ///

6                        2.       Prejudice to the Plan of Burke's Refusal to Submit to a Second IME

7   28.  Burke next argues that, whether or not the request for a second IME with Barry was reasonable,

8   Burke should not be penalized for refusing to submit to it because such refusal caused no prejudice

9   to the Plan.  Burke cites the instruction of the Court of Appeals, found at footnote 14 of the Burke

10  opinion:

> We also do not decide on this appeal whether it was an abuse of discretion for the
> Committee, alternatively, to base its decision on the procedural ground that Burke
> refused to attend the second IME.  In reviewing this, and any other procedural issue,
> anew under the *MetLife/Abatie* standard, the district court should address whether the
> Plan was prejudiced by the procedural default or, absent such prejudice, whether it
> would be an abuse of discretion to deny benefits for such a harmless error.

14  544 F.3d at 1027 n.14.  The only other case cited by plaintiff for the proposition that a showing of

15  prejudice is necessary to sustain a denial of her claim on procedural default grounds is Campbell v.

16  Allstate Ins. Co., 60 Cal.2d 303 (1963).  That case is not controlling here, because ERISA preempts

17  state insurance regulation for self-funded plans.  See FMC Corp. v. Holliday, 498 U.S. 52, 61

18  (1990); PM Group Life Ins. Co. v. Western Growers Assur. Trust, 953 F.2d 543, 546 (9th Cir.

19  1992).  Moreover, Campbell reviewed the requirement that an insurance company show prejudice

20  when it has denied a third-party claim on the basis that an insured failed to adhere to the provisions

21  of a cooperation clause.  In that case, the victim of the insured tortfeasor's negligence seeking

22  recovery was not the party who was bound by, or failed to meet, the cooperation clause.  Campbell,

23  60 Cal.2d at 305.

24

25  29.  Footnote 14 of the Burke decision notwithstanding, neither party has cited any controlling Ninth

26  Circuit case law in support of their respective positions as to whether a plan abuses its discretion

27

28

United States District Court
For the Northern District of California

under ERISA law by denying a claim based on the participant's failure to attend an IME absent a showing of prejudice to the plan.  Burke interprets footnote 14 to announce a rule that prejudice is required.  The Plan contends that the Court of Appeals left open the possibility that no abuse of discretion would be found, even absent prejudice.  This court finds the instruction in footnote 14 to be ambiguous, but assumes *arguendo* that absent a showing of prejudice a denial of benefits based on the beneficiary's failure to submit to an IME is an abuse of discretion.

30.  The concept of prejudice is frequently invoked in adversarial proceedings.  For instance, a court may decide to consider a brief that has been submitted late if such late submission has not prejudiced the opposing party.[9]  Viewing the relationship between Burke and the Plan through an adversarial lens, there is clearly prejudice to the Plan.  As noted, a plan may have legitimate concerns that a participant's physician is biased in favor of finding a disability.  A plan is at a disadvantage if participants are allowed to unilaterally nullify their obligations to submit to an examination by a physician of the plan's choosing.  Participants could "game" the development of the administrative record by submitting only the most favorable conclusions they could obtain on their own, while refusing to allow those conclusions to be tested by a physician they have not chosen.  In this case, the Plan was prejudiced in that it was unable to directly put the conclusions of Zwerin to the test through a recent examination by a doctor who the Plan felt confident was not biased toward finding total disability.

31.  One must bear in mind, however, that a participant and her ERISA plan administrator are not adversaries.  A plan administrator is a fiduciary of the plan participants.  See Glenn, 128 S.Ct. at 2347.  This means that the plan administrator's interest, if it is following the law, is not to deny benefits as often as possible but to come to the right decision in each case as to whether benefits are payable under the plan.  As a fiduciary with duties of care and loyalty to all participants, the administrator's role is to grant meritorious claims but to deny non-meritorious claims in order to protect the plan's assets for the benefit of other participants.  Accordingly, anything which impedes

the administrator's ability to determine whether a claim is meritorious is prejudicial to the administrator.  Even if Barry's examination would have *helped* Burke's case for disability, the Plan was prejudiced because Burke's failure to obtain the examination harmed the Plan's ability to come to the correct decision in fulfillment of its role as a fiduciary to Burke and to the other plan participants.  For all of the reasons already explicated, it is reasonable to believe that a second IME would have helped the Committee in its decision whether to grant Burke's appeal.  The Committee was deprived of this help.

32.  Accordingly, Burke's failure to abide by the plan terms, despite clear notice that such failure would result in a ground to deny her appeal, was prejudicial to the Plan.  Even taking into consideration the substantial structural conflict of interest under which the Plan operated, the court can discern no abuse of discretion in the Plan's denial of Burke's appeal on the basis of her refusal to accede to the reasonable request for a second IME.[10]

33.  Because the court finds no abuse of discretion in the denial of Burke's appeal on the basis of her failure to attend the second IME, Burke's challenges to the Plan's alternative grounds for denial are moot.

CONCLUSION

For the foregoing reasons, plaintiff's motion is DENIED and defendant's motion is GRANTED.  Judgment shall be entered accordingly.

IT IS SO ORDERED.

Dated: June 29, 2009

_____
MARILYN HALL PATEL
United States District Court Judge
Northern District of California

21

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ENDNOTES**

1.      The first thirty-seven pages of the administrative record comprise a copy of the "Pitney Bowes Inc. Long-Term Disability Plan As Amended and Restated Effective as of January 1, 1998." The court notes that document's index, <u>see</u> AR at 2-4, incorrectly reflects the page numbering of the following claim provisions, <u>see</u> AR at 5-36. Neither party has raised any issue regarding the authenticity or applicability of this copy of the Plan.

2.      This evidence was not part of the administrative record. As noted below, the Ninth Circuit ruled in <u>Abatie</u> that a district court may consider evidence outside the administrative record for the purposes of "determin[ing] the nature, extent, and effect on the decision-making process of the conflict of interest . . . ." <u>Abatie v. Alta Health & Life Ins. Co.</u>, 458 F.3d 955, 970 (9th Cir. 2006). This is consistent with the Supreme Court's instruction that the "walling off claims administrators from those interested in firm finances" is an issue germane to determining how much weight to give to a conflict of interest. <u>Metropolitan Life Ins. Co. v. Glenn</u>, 128 S.Ct. 2343, 2351 (2008). The makeup of the Committee is self-evidently germane to the determination of how heavily to weigh the Plan's structural conflict of interest.

        All other findings of fact have been drawn from information found in the administrative record. The Court of Appeals vacated this court's earlier ruling that it could not consider supplemental evidence submitted by Burke that was not part of the administrative record. <u>Burke</u>, 544 F.3d at 1027-1028. The interrogatory regarding the makeup of the Committee notwithstanding, Burke's supplemental evidence primarily pertains to her earlier claim for benefits and related litigation during the 1999-2002 time period. Such evidence is irrelevant to the narrow issue presented by the instant motion, namely whether the 2004 denial was an abuse of discretion insofar as it was based upon Burke's refusal to submit to a second IME. The issue of the timeliness of Burke's original claim plays into the conflict of interest analysis below; however, what is relevant is the Plan's waiver of that issue via the 2002 settlement agreement and subsequent reassertion, in 2004, a timeliness problem. The 2002 settlement agreement is contained in the administrative record.

3.      The Plan styled its motion as a motion for judgment under Rule 52, while Burke styled her motion as a motion for summary judgment.

4.      Burke initially argued that the Plan had not retained discretionary authority. The court ruled that the Plan had retained such authority, <u>see</u> Docket No. 24 (Order of Aug. 8, 2005), and the Court of Appeals agreed, <u>see</u> <u>Burke</u>, 544 F.3d at 1024.

5.      No evidence has been presented as to the respective proportions paid into the trust by the plan sponsor and its employees. The Plan itself sets no fixed proportion but rather states that the employer contribution is voluntary and may be changed at any time. AR at 21.

6.      In such cases, an employee is normally eligible for workers compensation benefits.

7.      Burke calls attention to the fact that the Plan wrote in a letter dated March 4, 2004, "First, please note that there are no 'additional materials or information necessary' for Ms. Burke to perfect her claim." Burke would have the court interpret this as a binding promise by the Plan that Burke would not be required to submit to any other examination before her appeal was heard. Firstly, that is not what the sentence says; it only addresses the perfecting of her claim. Secondly, Burke's interpretation is clearly a post hoc interpretation of the statement, since Burke participated in the Plan-requested June 28, 2004, FCE without objection.

8.      Burke does not dispute the Plan's contentions that the location chosen for the FCE was a reasonable distance from her home and that the plan sponsor made reasonable arrangements for Burke to attend the examination, specifically by providing the option of free livery service.

9.      This is just an example.  Litigants in this court miss deadlines at their peril.

10.      The instant action requires the court to evaluate whether the Committee's discrete decision in September 2004 was an abuse of discretion.  The fact that it was not an abuse does not necessarily mean that Burke can never again be eligible for LTD benefits under the Plan or that the Plan's duties to Burke have been fully discharged for all time.  See Gonzalez v. Guarantee Mutual Life Co., No. 97-4213, 1999 WL 329096, at *6 (N.D. Cal. 1999) (Conti, J.) ("Defendants' subsequent denials were also appropriate in that Plaintiff, through her refusal to submit to medical examinations[,] has made herself ineligible to receive benefits and will continue to be ineligible regardless of her actual physical condition until such time as she complies with these requests and Defendant Guarantee is able to properly evaluate her claim.").

**United States District Court**
For the Northern District of California

24